UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

Case No.   1:23-cv-572 (LEK/ML)

-------------------------------------------------------------------X

SHAWN RINGLING,

                   Plaintiff,

        -against-

PLUG POWER, INC., TOM ROURKE, individually, and
TOM O'GRADY, individually,

                   Defendants.

-------------------------------------------------------------------X

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Plaintiff, by and through his attorneys, Phillips and Associates, PLLC, upon information and belief, complains of Defendants, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, as codified §§ 2000e to 2000e-17 (amended in 1972, 19878 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), and to remedy violations of the New York State Human Rights Law, New York State Executive Law, §§ 296 et seq. ("NYSHRL"), based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 38 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking damages to redress the injuries he has suffered as a result of being harassed and discriminated against by his employer on the basis of his race (African American), together with creating a hostile work environment, failure to promote, retaliation, and constructive discharge.

## JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 42 U.S.C. §1981; Title VII, 28 U.S.C. § 1331, § 1343, and supplemental jurisdiction thereto.

3.     This action involves a Question of Federal Law.

4.     Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Northern District of New York. 28 U.S.C. §1391(b).

5.     On or about January 11, 2022, Plaintiff filed a Charge for this matter with the Equal Employment Opportunity Commission (EEOC).

6.     On or about February 10, 2023, Plaintiff received the Notice of Right to Sue from the EEOC.

7.     This suit is being filed within ninety (90) days of Plaintiff's receipt of his Notice of Right to Sue.

## **PARTIES**

8.     Plaintiff is an African American male resident of the State of New York, County of Rensselaer.

9.     At all times material, Defendant PLUG POWER, INC. (hereinafter also referred to as "PLUG POWER,") was and is a foreign business corporation duly incorporated under the laws of the State of Delaware.

10.    At all times material, Defendant PLUG POWER was and is a producer of hydrogen fuel cell technology.

11.    At all times material, Defendant PLUG POWER operated a warehouse located at 620 Van Patten Drive, Clifton Park, NY 12065.

12.    At all times material, Defendant TOM ROURKE (hereinafter also referred to as "ROURKE") was and is a Caucasian male resident of the State of New York.

13.    At all times material, Defendant ROURKE was and is a "Manager," for Defendant PLUG POWER.

14.     At all times material, Defendant ROURKE was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

15.     At all times material, Defendant TOM O'GRADY (hereinafter also referred to as "O'GRADY") was and is a Caucasian male resident of the State of New York.

16.     At all times material, Defendant O'GRADY was and is a "Manager," for Defendant PLUG POWER.

17.     At all times material, Defendant O'GRADY was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

18.     Defendant PLUG POWER, Defendant ROURKE, and Defendant O'GRADY are hereinafter also referred to as "Defendants."

19.     At all times material, Plaintiff was an employee of Defendants.

## MATERIAL FACTS

20.     In or around February 2020, Plaintiff was scheduled to interview for the Warehouse Technician position at Defendant PLUG POWER.

21.     On the day of his first interview, Plaintiff planned to meet with Defendant O'GRADY.

22.     Before the interview, Plaintiff accidentally drove to the wrong location.  As a result, Plaintiff was ten (10) minutes late.

23.     When Plaintiff arrived, he introduced himself to Defendant O'GRADY.  Defendant O'GRADY looked at him, and said, "No, you're late, you gotta go."

24.     Plaintiff interviewed with Defendant PLUG POWER a week later, this time, with Manager, Johnnie Felton (African American).  Due to Plaintiff's skills and experience, he was hired on the spot.

25.   In or around March 2020, Plaintiff began working for Respondent PLUG POWER as a temporary Warehouse Technician.

26.   At first, Plaintiff worked under Mr. Felton.  However, shortly after Plaintiff was hired, his team was split up, and he instead had to report to Defendant O'GRADY and Manager, Chris Jacobs.

27.   From the beginning of Plaintiff's employment, he experienced disparate treatment and discriminatory behavior from Defendants.

28.   For example, Plaintiff was directed by Defendant O'GRADY to do more work, with less help, than his non-African American colleagues.

29.   In or around July 2020, Defendant ROURKE began working at a Manager at Defendant PLUG POWER.

30.   Plaintiff complained to Defendant ROURKE on multiple occasions that he believed the workload was unfairly distributed based on race.  Plaintiff also told Defendant ROURKE that he felt he was treated less well than other employees because of his race.

31.   However, Defendant ROURKE never addressed Plaintiff's concerns, and continued giving Plaintiff a more significant workload than his non-African American colleagues.

32.   Throughout his time working for Defendant PLUG POWER, on multiple occasions, Plaintiff heard from employees and warehouse associates that Defendant O'GRADY had previously used the n-word towards African American employees.

33.   At first, Plaintiff disregarded these rumors, despite noticing that Defendant O'GRADY treated him less well than his non-African American colleagues.

34.   For example, Defendant O'GRADY often raised his voice at Plaintiff when speaking to him, while he maintained friendly communication with his Caucasian colleagues.

35.  In or around October 2020, due to his satisfactory performance, Plaintiff was hired as a full-time, permanent Warehouse Technician.

36.  However, during this time, in addition to the constant disparate treatment that he was experiencing, Plaintiff was the target of racially discriminatory comments at work.

37.  On one occasion, while Plaintiff was in the breakroom adjacent to the management office, he overheard a conversation between former Manager, Chris Jacobs, and Defendant O'GRADY.

38.  During the conversation, Plaintiff heard Defendant O'GRADY ask Mr. Jacobs, "**How would you feel about a black guy taking your job**?"

39.  In or around May 2021, these instances of disparate treatment and discriminatory comments escalated.

40.  Around this time, Plaintiff had a disagreement with Defendant O'GRADY regarding inventory.

41.  When the conversation concluded, and Plaintiff's back was turned away, he heard Defendant O'GRADY call him a "**fucking nigger**."

42.  Plaintiff was so surprised and disturbed that Defendant O'GRADY openly used the n-word at work, that he did not respond, and walked away.

43.  Shortly after this conversation, Plaintiff told Manager, Johnnie Felton (African American), that Defendant O'GRADY called him the n-word.

44.  Mr. Felton said that he wanted to keep things from escalating, and advised Plaintiff to "shake it off."

45.  Mr. Felton also told Plaintiff to tell him if Defendant O'GRADY used the n-word toward him again, and at that point, he (Mr. Felton) would contact Human Resources on Plaintiff's behalf.

46.  However, this was not the last time the n-word was used around the warehouse.

47.     In or around June 2021, Mr. Felton was separated from Defendant PLUG POWER.

48.     After Mr. Felton's employment separation, various employees at Defendant PLUG POWER

        printed out photos of Mr. Felton, and posted them around the warehouse.

49.     When Plaintiff went to the bathroom that day, he saw one of the photos of Mr. Felton posted

        on the wall.

50.     Underneath the photo of Mr. Felton (African American), someone had drawn a game of

        hangman, with the n-word spelled out underneath the picture.

51.     Plaintiff immediately reported the posted picture to Defendant ROURKE, who advised

        Plaintiff that he would "look into it."

52.     Plaintiff never heard about any investigation into this photograph.

53.     Shortly after this incident, Plaintiff contacted HR Representative, Brenda Morin, to report the

        unfair racial treatment he was experiencing at work.

54.     Plaintiff explained that he felt that he was getting more work than his non-African-American

        colleagues, and that he had not been compensated for taking on additional tasks.

55.     Following his initial message, Plaintiff and Ms. Morin had a phone call, where he disclosed

        that he felt that he was being targeted at Defendant PLUG POWER because of his race.

56.     Ms. Morin advised Plaintiff that she would investigate the matter.

57.     In or around the end of July 2021, Plaintiff learned of an open "Lead," position within his

        department through the employee portal.

58.     Plaintiff was interested in the role because he was already performing tasks assigned to a lead,

        and he would receive an increase in compensation.

59.     Plaintiff applied for the position, and was invited for a phone interview with Manager,

        Sebastian Anzevui.

60.     At the conclusion of the interview, Mr. Anzevui told Plaintiff that he would coordinate a second interview between Plaintiff and Defendant ROURKE.

61.     Plaintiff knew he had the requisite experience, because he had already taken on the responsibilities around the warehouse, and he had spent a year in the department.

62.     On or about August 5, 2021, after not hearing back from Ms. Morin regarding his complaints of discrimination, Plaintiff send a follow-up email.  The email read:

> "Hope you're having a good day so far.  I'm reaching out to you this morning because of an unfair work environment.  As I discussed with you in the past, I've had numerous issues with management of the warehouse at Clifton Park.  Besides what we've discussed in the past about my personal business being spread throughout the workplace and the false accusations that have been made against me.  I feel that this is an extremely racially biased company.  Not only has my word been discredited because I'm a person of color.  More tasks have been given to [me] more  than all the other employees who are not of color.  More work and no increase in my salary. Employees that are not of color call out of work on a consistent basis and I'm left with more than 90% of the workload throughout the day.  When those same employees return to work they do not attend to any of [their] tasks.  They have conversations throughout the day for long periods of time. Against while I'm stuck with the workload.  Management has been notified numerous times of my concerns the entire time I've been employed at [Defendant PLUG POWER].  I no longer address any concerns to Management of the Clifton Park Warehouse because all of my concerns were ignored once again because I am a person of color.  I've witnessed employees who are not of color get their concerns addressed immediately. It's gotten to the point where I'm mentally drained due to working for this company.  Everyday I feel more uncomfortable working here…"

63.     In or around the last week of August 2021, Plaintiff left work for a planned week of vacation.

64.     On or about September 3, 2021, when Plaintiff returned, Defendant O'GRADY once again targeted Plaintiff.

65.     For example, Defendant O'GRADY continued his discrimination and retaliation by belittling Plaintiff in front of his colleagues, yelling at him, and slamming his hands on his desk when talking to Plaintiff.

66.    Following this altercation, Complainant texted Ms. Morin:

> "Sorry to be reaching out once again.  We had another issue this morning
> with [Defendant O'GRADY].  I was busy working on important emails this
> morning.  [Defendant O'GRADY] comes up to me and asked me what I
> was doing.  I told him I had important emails to do.  He tells me I'm working
> on the wrong [shit] he used bad words when talking to me.  Then got upset
> and slammed his [hands] on my computer when I refused to do what he
> said.  He yelled for no reason.  There were a few people standing there as
> well that witnessed it.  I calmly walked off and spoke to [Mr. Carlton].  I
> asked him if it was okay for me to leave for the day being that I also havent
> had a day off this week.  He said it was ok.  This has gotten extremely out
> of hand at this point.  It's definitely time for legal action be taken place. . .
> [Defendant O'GRADY] is extremely racist and I have multiple people to
> support this as well."

67.    On or about September 6, 2021, Plaintiff and Ms. Morin had a phone call to discuss the

September 3, 2021, text message regarding Defendant O'GRADY's behavior.

68.    During the phone call, Plaintiff asked Ms. Morin for an update about scheduling a second

interview for the "Lead," position.

69.    At this time, Ms. Morin told Plaintiff he would not be proceeding to a second interview, and

would be denied the promotion to "Lead," because he was "not qualified."

70.    Following their telephone conversation, that same day, Plaintiff texted Ms. Morin:

> "Good morning, [Ms. Morin].   After our discussion regarding the
> discrimination against me at [Defendant PLUG POWER].  Which also
> includes me not getting an interview for the Lead position.  I understand
> you said I wasn't qualified which you didn't tell me until I filed a complaint
> with HR.  I'm sorry but that's definitely not the reason.  I have not gotten
> the 2nd interview or an increase in pay because of [Defendant ROURKE's]
> personal feelings against me.  So with that being said I contracted someone
> for more information.  It's been too many incidents and I feel nothing has
> been done to better my situation at work.  After every complaint I have to
> HR it went right back to discrimination against me.  [T]o the point where I
> do feel uncomfortable.  I've decided to take legal action against the
> company which I already started.  Just wanted to inform you of that.  Thank
> you for your help.  Have a good day."

71.   Plaintiff returned to work after he made his complaint, and was approached by several colleagues regarding his altercation with Defendant O'GRADY.

72.   Plaintiff's coworkers told him that Defendant O'GRADY was telling them that Plaintiff was "creating problems."

73.   On or about September 10, 2021, Plaintiff texted Ms. Morin again to complain about Defendant O'GRADY's behavior:

> "Now there's rumors being spread about me.  Lies being spread I'm completely done at this point.  I've been treated differently which is no[w] considered retaliation.  I no longer want to further discuss it with HR.  It's been a conflict of management.  Now they are getting employees to lie about what [Defendant O'GRADY] did to me.  I know all about managers and supervisors being friends outside the workplace.  This is why the same incidents kept happening over and over.  It's because management is protected.  Again I've had more than enough."

74.   On or about September 12, 2021, for his own mental health and wellbeing, Plaintiff emailed his letter of resignation to CEO, Andrew Marsh, Director of HR, Tammy Kimble, Vice President, Rick Mason, and General Manager of Applications and Global Accounts, Jay Crespo.  The letter said:

> "My name is [Plaintiff].  I'm a Former warehouse Tech at the Clifton Park Warehouse.  I'm using this email as a letter of resignation.  First off I'd like to say thank you for allowing me to be an employee at [Defendant PLUG POWER].  Unfortunately at this time I have to resign from the company due to multiple acts [of] racial discrimination and false accusations.  It all started the first time I was supposed to interview with [Defendant O'GRADY] for a position in the shipping department.  I was about 10 minutes late due to the [GPS] taking me to another location.  Which I explained to [Defendant O'GRADY].  He then looked me up and down with disgust and spoke to me in a nasty tone saying, 'No you're late you gotta go,' and sent me away.  2 days later I get a call from Manpower for another interview.  This time I interviewed with [Mr. Felton].  Who immediately hired me within minutes of my interview due to my experience.  Fast forward to when the pandemic started the teams were split up.  I just so happened to be on the same team and [Defendant O'GRADY].  For months as a temp [Defendant O'GRADY] would talk down on me, threaten to get

me fired and micromanage me over employees of non-color.  It was a horrible experience.  I had to stay quiet being that I was a temp.

75.   Plaintiff also described how Defendant ROURKE had participated in spreading rumors about

him (Plaintiff) throughout the warehouse.  Plaintiff went on to write:

> "A 2nd time [Defendant ROURKE] made me feel uncomfortable is when I brought to his attention how rumors were being spread about employees trying to get employees of non color removed from the workplace. [Defendant ROURKE] completely discredited anything I said and acted as if nothing happened. I filled multiple complaints with HR. The same things kept occurring. I later find out that there's a conflict of management between [Defendant ROURKE], [Defendant O'GRADY] and [Ms. Morin] from HR. They all were working together to ignore my complaints.
>
> I finally couldn't take it anymore when on Friday September 6th [Defendant O'GRADY] walked up to me screaming in my face to get me to stop what I was doing to do his cycle count. When I was in the middle of working on an extremely important email. That involved production getting shut down If they didn't get the part. [Defendant O'GRADY] continued yelling and cursing. Then finally slamming his hand down next to me nearly hitting me. At that point I calmly walked away and told my supervisor [Mr. Carlson] the situation and asked if I can go home for the day. I contacted HR and explained everything. When I came back the next day more rumors were being spread about me from [Defendant O'GRADY] and [Defendant ROURKE]. I contacted HR letting them know I'll be resigning due racial discrimination and My mental health being destroyed dealing with this disgusting behavior. I'm in a worst mental state now because I don't have an income to cover my bills. The only option I was given that made sense was that HR agreed to pay until the date I originally said I would leave which is September 30th. There's so much more that needs to be addressed with [Defendant ROURKE] and [Defendant O'GRADY] but, I'm sure they'll continue to get saved by Human Resources. [Defendant ROURKE] also stopped my growth within the company after I had an excellent interview with Sebastian. They lied and said I was under qualified. I strongly suggest you focus on what's going on at the Clifton park warehouse. That building is literally falling apart due to poor management. I'd like to thank you for your time and I hope you can get to the bottom of the madness in that warehouse."

76.   Plaintiff never received a response to his email.

77.   Following his separation from the company, during a final conversation about work, Plaintiff

received a text from Manager, Mr. Carlson (first name currently unknown), that read:  "Take

care of yourself [Plaintiff].  You're a smart person with a good work ethic.  You will do a lot better than [Defendant PLUG POWER].  Use me as a reference anywhere and I'll tell them nothing but good things."

78. Defendants' actions were intended to constructively discharge Plaintiff.

79. Defendants would not have discriminated against Plaintiff but for his race.

80. Defendants would not have retaliated against Plaintiff but for his complaints of race discrimination and disparate treatment.

81. Defendants failed to promote Plaintiff because of his race, and/or in retaliation for his complaints of race discrimination.

82. As a result of Defendants' actions, Plaintiff felt, and continues to feel, extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

83. As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, he suffered and continues to suffer severe emotional distress and physical ailments.

84. As a result of the acts and conduct complained of herein, Plaintiff has suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

85. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower courts.

86. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against Defendants.

## AS A FIRST CAUSE OF ACTION
## UNDER FEDERAL LAW
## 42 U.S.C. SECTION 1981

87.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs

of this Complaint as if more fully set forth herein at length.

88.     42 U.S.C. Section 1981 states in relevant part as follows:

   a.   Statement of equal rights All persons within the jurisdiction of the United States shall
        have the same right in every State and Territory to make and enforce contracts, to sue,
        be parties, give evidence, and to the full and equal benefit of all laws and proceedings
        for the security of persons and property as is enjoyed by white citizens, and shall be
        subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,
        and to no other.

   b.   "Make and enforce contracts" defined for purposes of this section, the term "make and
        enforce contracts" includes the making, performance, modification, and termination of
        contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the
        contractual relationship. 42 U.S.C.A. § 1981.

89.     Plaintiff was discriminated against because of his race as provided under 42 U.S.C. Section

1981 and has suffered damages as set forth herein.

## AS A SECOND CAUSE OF ACTION
## UNDER TITLE VII
## DISCRIMINATION
## (Against the Corporate Defendant Only)

90.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

91.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights

Act of 1964; 42 U.S.C. Sections 2000e et Seq., as amended, for relief based upon the unlawful

employment practices of the above-named Defendants.  Plaintiff complaints of Defendants'

violation of Title VII's prohibition against discrimination in employment based, in whole or in

part, upon an employee's race.

92.   Defendant PLUG POWER engaged in unlawful employment practices prohibited by 42 U.S.C.

§2000e et seq., by discriminating against Plaintiff because of his race, together with creating a

hostile work environment, failure to promote, and constructive discharge.

### AS A THIRD CAUSE OF ACTION
### UNDER TITLE VII
### RETALIATION
### (Against the Corporate Defendant Only)

93.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs

of this Complaint as if more fully set forth herein at length.

94.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall

be an unlawful employment practice for an employer:

> "(1) to. . .discriminate against any of his employees…because he has opposed
> any practice made an unlawful employment practice by this subchapter, or
> because he has made a charge, testified, assisted or participated in any manner
> in an investigation, proceedings, or hearing under this subchapter."

95.   Defendant PLUG POWER engaged in an unlawful employment practice prohibited by 42 U.S.C.

§2000e et seq. by discriminating against Plaintiff with respect to terms, conditions, or privileges

of employment because of his opposition to the unlawful employment practices of Defendant

PLUG POWER.

### AS A FOURTH CAUSE OF ACTION
### UNDER NEW YORK STATE HUMAN RIGHTS LAW
### DISCRIMINATION

96.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs

of this Complaint as if more fully set forth herein at length.

97.   Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For

an employer or licensing agency, because of an individual's . . . race… to refuse to hire or

employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

98.   Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of his race, together with creating a hostile work environment, failure to promote, and constructive discharge.

99.   Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

**AS A FIFTH CAUSE OF ACTION
UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
RETALIATION**

100.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

101.   New York State Executive Law § 297(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminated against any person because he has opposed any practices forbidden under this article."

102.   Defendants engaged in an unlawful discriminatory practice in by retaliating, and otherwise discriminating against the Plaintiff because of his opposition to his employer's unlawful employment practices.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.   Declaring that the Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §1981, Title VII, and the New York State Human Rights Law on the basis of his race, together with creating a hostile work environment, failure to promote, retaliation, and constructive discharge.

14

B.  Awarding damages to the Plaintiff, for all lost wages and benefits, past and future, back pay and front pay and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practice;

C.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

**JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff demands judgment against Defendants, in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: May 10, 2023
       New York, NY

PHILLIPS & ASSOCIATES, PLLC
*Attorneys for Plaintiff*

By: _____
    Laura E. Bellini, Esq.
    45 Broadway, Suite 430
    New York, NY 10006
    212-248-7431